ORIGINAL

07 CV 7358

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ANTHONY REALE, derivatively on behalf of ITT COMPANY,

        Plaintiff,

vs.

STEVEN R. LORANGER, CURTIS J. CRAWFORD, CHRISTINA A. GOLD, RALPH F. HAKE, DR. JOHN J HAMRE, RAYMOND W. LEBOEUF, FRANK T. MACINNIS, LINDA S. SANFORD, MARKOS I. TAMBAKERAS, JOHN DOE DEFENDANT MANAGER A, JOHN DOE DEFENDANT MANAGER B, JOHN DOE DEFENDANT MANAGER C, JOHN DOE DEFENDANT MANAGER D, and JOHN DOE DEFENDANT LAW FIRM,

        Defendants,

-and-

ITT COMPANY,

        Nominal Defendant.

------------------------------------------------------------x

Civil Action No.

JURY TRIAL DEMANDED

FILED U.S. DISTRICT COURT S.D. OF N.Y. 2007 AUG 17 PM 2:29

Plaintiff Anthony Reale, for his Verified Derivative Complaint by and through his undersigned attorneys, alleges the following based on, *inter alia*, the Plea Agreement, Statement of Facts, and associated documents filed in connection with the guilty plea entered by ITT Company ("ITT" or the "Company") entered in connection with *United States of America v. ITT Company*, Cr. No. 07-22 (W.D. Va.), as described below. All facts relating to Plaintiff and his own acts are pled on personal knowledge, while other facts are pled on information and belief.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action brought for the benefit of nominal defendant ITT against certain members of its Board of Directors ("the Director Defendants") who served during the period of time encompassing the acts complained of herein and certain ITT Managers and an outside law firm (named herein as John Does), seeking to remedy defendants' breaches of fiduciary duties and other violations of law that have caused damage to ITT. This case arises out of a criminal proceeding in which ITT pled guilty on March 27, 2007 to federal felonies involving the willful export of defense articles without a license and the willful omission of statements of material fact in arms control exports. As stated in the Plea Agreement, *"ITT agrees that it is pleading guilty. . .because ITT is in fact guilty."* In connection with this Plea Agreement, ITT agreed to pay *$100 million* in shareholder money in criminal fines, penalties, and forfeitures. ITT also agreed to a deferred prosecution agreement with respect to the criminal charge of willful violation of the international traffic in arms regulations (ITAR) and export of defense

articles without a license, and agreed to pay for the costs of an independent monitor and staff to monitor its compliance with the deferred prosecution agreement and federal law. In the words of the United States Attorney who oversaw the prosecution, "ITT managers created an atmosphere where U.S. export laws were viewed as obstacles to getting business done. This atmosphere led to the transfer of sensitive military technology to the Republic of China, and others.

2. Named herein as "John Doe" defendants are four managers of ITT's Night Vision Division (the "John Doe defendants Managers A, B, C, and D") whose conduct while employed as decision-makers with managerial authority within ITT was, in large part, responsible for the government's criminal investigation and the criminal charges to which ITT pled guilty (collectively, "the Manager Defendants"). The lawsuit also names as a defendant the outside law firm (the "John Doe defendant law firm") that conspired with the managers and with ITT to cover up and conceal defendants' conduct from the government's investigators. The John Doe Defendants' conduct as described herein was the proximate cause of the damages that ITT suffered as a result of defendants' participation in, reckless failure to prevent, or aiding and abetting the illegal export of technical data, drawings, and specifications relating to military night vision systems, and the illegal omission of material facts from required arms export reports submitted to the government, causing those reports to be patently misleading and false. The Director Defendants failed to exercise good faith in carrying out their duty to prevent such acts, and to pursue appropriate legal and remedial action once these activities were fully uncovered.

Over a period of many years, The John Doe Defendants instituted and carried out an elaborate and complex scheme of deceit, subterfuge, and concealment directed against agencies of the federal government to facilitate their scheme and plan of (a) subverting the export control laws of the United States and (b) exporting classified information dealing with military night vision systems to foreign countries in violation of multiple criminal laws and government regulations. The motive behind this scheme, which compromised the safety and welfare of American combat troops during a war and eroded the national security of the United States, was simply to make additional profit, at the expense of our soldiers, the government, and ultimately the Company itself.

3.     At all relevant times, ITT was the leading manufacturer of night-vision equipment for the United States. It is currently the twelfth largest supplier of sophisticated defense systems to the U.S. military. In a gross abuse of the trust and responsibility bestowed upon ITT to enhance our military's success and to preserve our nation's safety, ITT's executives threatened our national security in a direct and substantial way by providing foreign countries with classified technical data relating to military night vision capabilities.

4.     By sharing top secret military data relating to night vision equipment with foreign entities, ITT's executives single-handedly threatened to strip our soldiers of the advantage they formerly enjoyed in combat operations against military adversaries who did not have access to this equipment. As the United States Attorney for the Western District of Virginia explained, "The criminal actions of this Company have threatened to turn on the

lights on the modern battlefield for our enemies and expose American soldiers to great harm." There can be no doubt -- and, by its guilty plea, ITT has so acknowledged -- that ITT's executives jeopardized our national security and the safety of our military men and women on the battlefield.

5. In the course of a wide-ranging criminal investigation, various government agencies, such as the Department of Justice, the Department of Defense, the Bureau of Immigration and Customs Enforcement, and Homeland Security discovered that ITT's executives had disseminated defense-related technical data to Singapore, the People's Republic of China, and the United Kingdom, without notifying or obtaining approval from the State Department. This technical data related to laser counter-measures for military night vision systems, designated as defense articles on the United States Munitions List, as well as to helmet-borne night vision technology. The State Department classified the technology for the laser counter-measures as "Secret - No Foreign," meaning it could not be shared even with friendly governments like Britain, and certainly not with potential strategic threats, such as China.

6. Although, as the U.S. Attorney for the Western District of Virginia stated, American soldiers were "the principal victims of ITT's crimes," and although the harm to the Company and its shareholders is monetary and not potentially fatal, the consequences of the conduct described herein have been, and will continue to be, severe for the ITT and, by extension, its shareholders. For example, in addition to the $100 million in penalties and forfeitures described below, the Company is now the subject of independent monitoring.

5

7.   As a result of defendant's misconduct, a criminal information dated March 26, 2007 was filed against ITT in a criminal action captioned *United States of America v. ITT Company*, Cr. No. 07-22 (W.D. Va.), charging it with three felony counts of violating the Arms Export Control Act of 1976, 22 U.S.C. § 2778 and specified sections of ITAR, 22 C.F.R. §§ 127.1(a) & 127.3. The size of the penalties imposed upon ITT pursuant to its guilty plea demonstrates how severely the government regarded ITT's transfer of such sensitive military technology to foreigners. On March 27, 2007, ITT agreed to pay a total payment of *$100 million* in penalties and forfeitures in connection with its guilty pleas to the charges. The penalties are as follows: ITT will pay an upfront $2 million criminal fine ($1 million for each felony charge), pay an upfront $20 million penalty to the State Department, and forfeit to the federal government $28 million in proceeds derived from its illegal actions, a portion of which will be shared with state, local, and federal law enforcement agencies to reimburse them for the cost of their work during the investigation that led to the criminal charges. Within the next five years, ITT may either pay the remaining $50 million fine or invest dollar for dollar in the research of advanced night-vision technology, to which the United States government will obtain all rights -- and which technology the government will share with any competing defense contractors for future contracts -- to ensure that members of the U.S. Armed Forces will have access to "the most capable night vision equipment in the world." The $50 million will also be used to cover the cost of government monitors to ensure that ITT does not again illegally export sensitive technology. Any amount of the $50 million penalty that remains unspent after five

years must be immediately paid to the United States. As the United States Attorney stated, ITT will pay this last $50 million "in restitution to the victims of their crimes -- the American soldier."

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00 exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it otherwise would not have.

9. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a substantial part of the events, actions or omissions to act giving rise to the claims occurred within this judicial district. In addition, nominal defendant ITT's principal place of business is located in this district.

## PARTIES

10. Plaintiff, a New Jersey citizen, is the owner of ITT common stock, which he has held at all times relevant hereto.

11. Nominal Defendant ITT is a Company organized under the laws of Indiana with its corporate headquarters located at 4 West Red Oak Lane, White Plains, New York 10604. ITT supplies advanced technology products and services in several growth markets. It plays a vital role in national and international security through its defense communications and electronic products, space surveillance and intelligence systems, and

advanced engineering and related services. ITT has become the leading manufacturer of night-vision equipment for the United States Armed Forces.

12. Defendant ITT is named as a nominal defendant herein solely in a derivative capacity. This action is brought on ITT's behalf and no claims are asserted against it.

13. Defendant Steven R. Loranger ("Loranger") has served as Chairman of the Board, President, and Chief Executive Officer of ITT since June 28, 2004. He is a citizen of New York.

14. Defendant Curtis J. Crawford (Crawford) has served as a director of ITT since 1996. He is a citizen of California.

15. Defendant Christina A. Gold (Gold) has served as a director of ITT since 1997. She is a citizen of Colorado.

16. Defendant Ralph F. Hake (Hake) has served as a director of ITT since 2002. He is a citizen of Michigan.

17. Defendant Dr. John J. Hamre (Hamre) has served as a director of ITT since 2000. He is a citizen of the District of Columbia.

18. Defendant Raymond W. LeBoeuf (LeBoeuf) has served of ITT as a director since 2000. He is a citizen of Florida.

19. roy jacobsdtmax6052Defendant Frank T. Macinnis (Macinnis) has served as a director of ITT since 2001. He is a citizen of Connecticut.

20. Defendant Linda S. Sanford (Sanford) has served as a director of ITT since 1998. She is a citizen of New York.

21. Defendant Markos I. Tambakeras (Tambakeras) has served as a director of ITT since 2001. He is a citizen of Pennyslvania.

22. Defendants Loranger, Crawford, Gold, Hake, Hamre, LeBoeuf, Macinnis, Sanford, and Tambakeras are collectively referred to as the Director Defendants.

23. The John Doe Defendants named herein are four managers of ITT's Night Vision Division who had direct, personal responsibility for causing ITT to commit the criminal offenses to which it has pled guilty (named herein as John Doe defendant managers A, B, C, and D, respectively), and an outside law firm that knowingly concealed ITT's illegal conduct from the United States government. The identities of the John Doe Defendants are presently unknown, but plaintiff will request permission to conduct prompt discovery to ascertain their identities and, when their identities have been established, to substitute their real names for the John Doe designations that appear herein.

## Obligations of the Director Defendants

24. The Director Defendants, by reason of their corporate directorship and/or executive positions, are fiduciaries to and for the Company's shareholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's shareholders.

25. According to ITT's Schedule 14A Proxy Statement filed with the SEC on April 1, 2006, the role of ITT's Board is "to oversee the actions and results of management. In discharging its responsibilities, the Board of Directors will act in the best interests of the Company and its shareholders." The Board also "sets policy for the Company and advises

and counsels the Chief Executive Officer and senior executives who manage the Company's business and affairs."

26. Accordingly, each Director Defendant owed ITT and its shareholders the duty to exercise due care, diligence, and loyalty in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed ITT the duty of full and candid disclosure of all material facts related thereto.

27. To discharge these duties, the Director Defendants were required to exercise reasonable and prudent supervision over ITT's management, policies, practices, controls, and financial and corporate affairs. By virtue of this obligation of ordinary care and diligence, the Director Defendants were required, among other things, to:

   a. manage, conduct, supervise, and direct the employees, business, and affairs of ITT in accordance with federal laws, rules and regulations, and not to violate federal law, rules, and regulations, including the criminal laws of the United States;

   b. ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by ITT;

   c. remain informed as to how ITT was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or illegal practices, to make reasonable investigation in connection therewith, and to take steps to correct that condition or practice;

   d. supervise the preparation, filing, and/or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by ITT, and to

examine and evaluate any reports of examinations, audits, or other information concerning the financial state of ITT, and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above;

      e.    exercise reasonable control and supervision over ITT's officers and employees;

      f.    maintain and implement an adequate system of internal controls at ITT, including financial, accounting, and management information systems;

      g.    examine and evaluate any reports of examinations or investigations by government agencies concerning the practices, products, or conduct of ITT officers, directors, or employees, to supply true, accurate, and complete information to all government agencies at all times, and to ensure that no information supplied to any government agency is incomplete, false, or misleading.

      h.    assure that the assets of the Company and its subsidiaries are utilized in the most effective manner and that and capital expenditures and appropriations are reviewed; and

      i.    preserve and enhance ITT's reputation as befits a public Company, and to maintain public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations.

### Obligations of the Corporate Responsibility Committee

28.    In their capacities as directors, defendants Crawford, as Chair, along with

defendants Gold, Hamre and Tambakeras, served on the Board's Corporate Responsibility Committee. The Corporate Responsibility Committee is responsible for, among other things:

    a.    reviewing and making recommendations concerning the Company's roles and responsibilities as a good corporate citizen;

    b.    reviewing and considering major claims and litigation involving the Company and its subsidiaries;

    c.    regularly assessing the adequacy and effectiveness of the Company's Code of Corporate Conduct and reviewing any violations of the Code; and

    d.    examining the Company's programs and policies for effecting compliance with laws and regulations, including international and environmental laws and regulations.

29.    Defendants Crawford, Gold, Hume, and Tambakeras are collectively referred to as the "Corporate Responsibility Defendants."

## Obligations of the Audit Committee

30.    In their capacities as directors, defendants Hake, as Chair, along with defendants Gold, Hamre, and LeBoeuf served on the Board's Audit Committee. The Audit Committee is responsible for, among other things:

    a.    reviewing with management and the independent auditors the effect of regulatory and accounting initiatives on the Company's financial statements;

    b.    reviewing and discussing with management the types of

information to be disclosed and the types of presentations to be made with respect to the Company's earnings, press releases, and rating agency presentations;

  c. monitoring and discussing with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness;

  d. updating the Board on a regular basis with respect to matters coming to its attention which may have a significant impact on the Company's financial condition or affairs, the Company's compliance with legal or regulatory requirements, and the performance and independence of the independent auditors and the internal audit function;

  e. reviewing all material related-party transactions before initiation of the transaction and making recommendations to the Board for approval or disapproval; and

  f. reviewing and approving procedures for receipt, retention, and treatment of complaints received by the Company.

31. Defendants Hake, Gold, Harnre, and LeBoeuf are collectively referred to as the "Audit Defendants."

### Obligations of the Compensation and Personnel Committee

32. In their capacities as directors, defendants Tambakeras, as Chair, along with defendants Crawford, MacInnis, and Sanford served on the Board's Compensation and Personnel Committee. The Compensation and Personnel Committee is responsible for, among other things:

  a. approving and overseeing administration of the Company's

employee compensation program, including incentive plans and equity-based compensation plans;

      b.    evaluating senior management and chief executive officer performance; and

      c.    evaluating and making regular reports to the Board on matters concerning management performance.

33.    Defendants Tambakeras, Crawford, MacInnis, and Sanford are collectively referred to as the "Personnel Defendants."

### Obligations of the Nominating and Governance Committee

34.    In their capacities as directors, Defendant MacInnis, as Chair, along with defendants Hake, LeBoeuf, and Sanford served on the Board's Nominating and Governance Committee. The Nominating and Governance Committee is responsible for, among other things:

      a.    developing, annually reviewing, updating, and recommending to the board corporate governanance principles for the Company;

      b.    evaluating and making recommendations to the Board concerning the composition, governance, and structure of the Board; and

      c.    determining desired Board skills and attributes, and conducting searches for prospective board members whose skills and attributes reflect those desired for the Board.

35.    Defendants MacInnis, Hake, LeBoeuf, and Sanford are collectively

referred toas the "Governance Defendants."

## DEMAND ALLEGATIONS

36.     Demand on ITT to commence legal action action was made by letter dated April 12, 2007 directed to Defendant Loranger. (Attached hereto as Exh. A). However, defendants have only replied that they would retain outside counsel to investigate this demand, but have not done so, to Plaintiff's knowledge. More than four months have elapsed since the Demand was made, and the relevant facts to be "investigated" by ITT were already detailed in the criminal Statement of Facts, and conceded by ITT to be true and accurate. Every day that goes by jeopardizes ITT's ability to recover on the claims asserted herein, and there is no reason to believe that ITT will act on the Demand made in a timely fashion, if at all. Accordingly, Plaintiff has made sufficient effort under Fed. R. Civ. P. 23.1 to get ITT to bring this action, and need do no more.

37.     The Director Defendants breached his or her fiduciary duties by abdicating their responsibilities of supervision and oversight of ITT's employees and business operations, and/or by failing to disclose the wrongdoing to the Company's shareholders.

38.     The Corporate Responsibility Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to assess the adequacy and effectiveness of the Company's Code of Corporate Conduct and to review any violations of the Code, all as mandated in its Board Charter. Proper assessment would have uncovered and led to correction of the egregious and felonious misconduct described herein.

39.     The Audit Defendants either caused or recklessly ignored the felonious