misconduct described therein by failing regularly to monitor and discuss with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness. Proper monitoring would have uncovered and led to correction of the felonious misconduct described herein.

40.     The Personnel Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to evaluate senior management and chief executive officer performance --including the performance of John Doe defendant managers B, C, and D, and to evaluate and make regular reports to the Board on matters concerning management performance. Proper evaluation would have uncovered and led to correction of the felonious misconduct described herein.

41.     The Governance Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to develop, review, update, and recommend to the Board corporate governance principles for the Company. Proper development and review would have uncovered and led to correction of the felonious misconduct described herein.

42.     Upon learning of its violations of law and mismanagement of Company assets, ITT took no internal action against the Director Defendants or anyone else to recover the $100 million their fiduciary breaches cost the Company. Justice Department officials revealed that ITT was aware that its executives were engaged in a multi-year conspiracy to violate the criminal law and export control rules for classified military equipment, as well as its violating its export licenses for night-vision equipment, but failed

to take significant corrective action. John Schoeneweiss, a senior agent of the Defense Department's Defense Criminal Investigative Service, has stated that the ITT's "serious violations" ran deep and "[t]he problem that we encountered was in the culture -- the willful self blinding of company officials." The facts underlying this matter fully bear out his assessment.

43. Moreover, defendant Loranger confirmed the Company's wrongdoing by announcing that "serious violations [i.e., multiple felonies] occurred," and acknowledged that ITT "had gaps in our compliance programs." Nevertheless, despite admitting that ITT executives had engaged in conduct that was illegal and extremely detrimental to ITT shareholders (not to mention to American soldiers engaged in combat and to ITT's Company reputation, which now lies in tatters), as well as pleading guilty to criminal charges with the Department of Justice, the Company has failed to take any internal action against the Director Defendants or anyone else for their breaches of fiduciary duties and gross mismanagement of ITT assets.

44. In addition, ITT has agreed to indemnify its directors against liability for acts and omissions occurring in the performance of their duties as directors, and maintains insurance policies to cover the costs of such indemnification. However, under the terms of the directors' indemnification agreement, the Company will not indemnify directors for any breaches of their fiduciary duty to act in good faith and in a manner they reasonably believe to be in or not opposed to the best interest of the Company. Directors are also not covered for engaging in any acts or omissions which involve intentional misconduct or a knowing

17

violation of law, such as the conduct to which ITT pled guilty in connection with this matter.

45. In order to bring this action for breaches of fiduciary duty and gross mismanagement of corporate assets in connection to ITT's imprudent and illegal business practices, the Director Defendants would have to sue themselves and/or their fellow directors for conduct that is excluded from coverage under ITT's indemnification agreement.

46. ITT's Board is effectively disabled from complying with any demand that would cause it to bring suit against the Director Defendants and others because to do so would result in the loss of their insurance coverage. They would not initiate such litigation, nor be able to prosecute any such action.

47. The Director Defendants' actions or willful inactions, as a result of their failures as Board and relevant committee members, have already resulted in guilty pleas to criminal felony charges, as well as the imposition of substantial financial penalties, and have also exposed the Company to massive civil liability and expense. ITT has nonetheless failed to hold any Director Defendants or any other persons responsible for the harmful effects of their actions on itself and its shareholders. Demand on the Director Directors has been sufficiently made and *de facto* refused. In the alternative, demand was futile at the time it was made, and has proved futile as months have elapsed with no meaningful response.

## DERIVATIVE ALLEGATIONS

48. Plaintiff brings this action derivatively on behalf of ITT to enforce its claims against the Director Defendants and the Joe Doe defendants, which claims may properly be asserted by the Company but which it *has failed* to assert.

49. The wrongs complained of herein occurred during the period when plaintiff was an ITT shareholder. Plaintiff continues to hold his ITT shares. Hence, plaintiff has standing to bring this derivative action on behalf of ITT to recover damages for all of the conduct described herein.

50. Plaintiff will fairly and adequately protect the interests of ITT and its shareholders in enforcing the rights of ITT against the named defendants. Plaintiff's attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of ITT to insure its rights and those of its stockholders. Plaintiff has no interests adverse to the Company.

## SUBSTANTIVE ALLEGATIONS

51. The government's investigation of ITT began in August 2001, when special agents of the Defense Department's Criminal Investigative Service (DCIS) were made aware that employees of ITT Night Vision (ITT NV), a division of ITT located in Roanoke, Virginia, had illegally sent a classified government document designated "Secret" and "NOFORM" ("no foreign") to an unauthorized facility in the United Kingdom (U.K.) Pursuant to a 2002 referral from DCIS and the Customs Service, a federal prosecutor was assigned to the investigation. During the ensuing four years, the government uncovered a

consistent pattern of violation of federal export laws at ITT NV *going back to the 1980s* and continuing, despite the fact of the on-going investigation, to 2006.

### ITT NV Export Compliance Background

52. ITT NV has produced night vision equipment for the American military for more than 30 years, during which time the government has awarded it many millions of dollars pursuant to contracts to develop and produce, in conjunction with government scientists and engineers, new night vision equipment requested by the military. Such night vision equipment is deemed critical to the United States' war-fighting capabilities. The equipment is extremely sensitive, and is highly sought after by U.S. allies and enemies alike.

53. Recognizing the inordinate sensitivity of U.S. military night vision equipment and technology, the State Department restricts export of such defense articles -- including technical data, drawings and specifications, services, and equipment related to military night vision systems -- pursuant to the Arms Export Control Act and its implementing regulations, the International Traffic in Arms Regulations (ITAR). Pursuant to 22 U.S.C. § 2778, it is a criminal offense willfully to fail to obey ITRA provisions. Indeed, certain of the technical documents and information related to military night vision equipment are so sensitive -- and, in the wrong hands, so potentially damaging to the United States -- that the documents and information are protected as classified information. Willful or grossly negligent transfer of such material to a person not authorized to receive it is a criminal offense pursuant to 18 U.S.C. §§ 793(d) and 793(f).

54.    ITT NV was well aware of the law's requirements, including the necessity to obey all relevant ITAR regulations. But ITT failed to establish a system to ensure compliance with the relevant federal export laws. Throughout the 1980s and 1990s, ITT NV employees who attempted to ensure ITT's compliance with ITAR regulations were viewed by some ITT NV managers as obstacles to getting business done. So severe was the lack of support from certain ITT NV managers that one ITT NV employee who insisted on following the export laws felt it necessary to inform her direct manager, named herein as John Doe defendant Manager A (Manager A), that she would not ever break the law, falsify documents, or break government regulations, and that she worked at ITT NV to do a job to the best of her ability and to make a life for herself and her family, not to go to jail for anybody, including ITT NV.

55.    This employee's concern that Manager A might instruct her to break the law was grounded in a firm basis in reality. For example, in November 1998, Manager A asked an ITT NV employee to send sensitive export-controlled night vision equipment to a foreign customer for which ITT NV did not have an export license authorizing permanent transfer of such equipment. The employee told Manager A that she was willing to apply to the State Department for an export license. Manager A responded that the State Department would never approve such a license, and the employee agreed. Nonetheless, despite the clear understanding that ITT NV did not have a license for the transfer and that the State Department would not approve such a transfer, Manager A ordered the employee to make the illegal transfer anyway. In protest of this direct order, the employee wrote on

21

the shipment paperwork that she had been directed to transfer the night vision equipment over her objections.

56. The employee later informed Manager A that she would never break the law again and that he could fire her if he wanted. The employee then informed appropriate personnel at ITT Defense, the ITT management group that oversees, *inter alia*, ITT NV, about the entire incident. Instead of firing or disciplining Manager A, ITT Defense placed Manager A into a position where he was designated as the ITT NV official responsible for ensuring that the ITAR regulations he had so blatantly violated were enforced. Moreover, neither ITT NV nor ITT Defense informed anyone in the government about the illegal transfer of the highly sensitive export-controlled night vision equipment. The government learned about this squalid affair only through the course of the criminal investigation.

### False and Misleading Statements Relating to Export Consignments

57. ITT NV regularly and routinely loaned or consigned export-controlled night vision equipment to foreign customers for evaluation and testing. In each such instance, ITT NV was required to obtain a temporary export license from the State Department's Office of Defense Trade Controls Licensing, and each temporary export license required that ITT NV ensure that the equipment be returned during the 4-year license period. Throughout the 1990s, however, ITT NV failed to secure return of much such equipment during its alloted 4-year period., and as a result lost track of numerous pieces of state-of-the-art night vision equipment, many of which remain missing.

58. On April 13, 2000, an outside law firm acting for ITT NV -- named herein

22

as John Doe Defendant Law Firm (Law Firm) -- sent a Preliminary Notification of Voluntary Disclosure (Preliminary Disclosure) to the Acting Director of the Compliance Analysis Division, Office of Defense Trade Controls, in the State Department (ODTC). The letter stated in pertinent part: "[ITT NV] recently discovered apparent violations of the ITAR that involve ITT's loans and consignments of night vision equipment to foreign persons." A copy of this letter was sent to corporate counsel for ITT Defense. On May 19, 2000, the Law Firm sent a second letter to ODTC on behalf of ITT NV, providing a "disclosure, as well as a description of mitigating factors and corrective actions." The May 19 letter stated in pertinent part, "Upon realizing that it had a compliance issue with respect to these temporary exports, ITT took corrective action described below." The Law Firm attached to the May 19 letter a certification signed by an ITT NV manager, who was designated as a person whom ITT NV had designated to sign on its behalf, stating that "all of the representations made in connection with the voluntary disclosure are true and correct to the best of the Company's knowledge and belief."

59. The Law Firm intended the April 13 and May 19 disclosure letters to create the impression with the decision-makers at the State Department that ITT had only "recently discovered" its temporary export license non-compliance problems, and that, "[u]pon realizing that it had a compliance issue with respect to these temporary exports," ITT NV immediately addressed the issue and did everything within its power to rectify the violations. The Law Firm and ITT NV reinforced the impression of "corrective discovery followed by swift corrective action" by ITT NV's repeated references to the two disclosure

letters in its ensuing correspondence and negotiations with the State Department.

60. In part based on reliance on the impressions that the disclosure letters created, the State Department ultimately elected not to refer the ITT NV temporary export license issue to the Justice Department for prosecution. Instead, the State Department allowed ITT to combine these violations with two other serious sets of export compliance violations into a single civil consent agreement that was executed on October 25, 2004. ITT was required to pay an $8 million monetary penalty, but did not have to admit any wrongdoing. Most importantly, ITT avoided the major impact of a prospective debarment from obtaining future export licenses from the State Department. In addition, the Company obtained the State Department's agreement that it "disclosued voluntarily all information concerning the facts and circumstances of the alleged violations. . .and has fully cooperated with the [State] Department."

61. The reality, however, was precisely the opposite. The government's subsequent criminal investigation established that counsel for ITT Defense and the Law Firm intentionally withheld from the State Department material facts, information, and circumstances about the export license violations in an effort to limit the potential penalties and consequences that the government might otherwise have imposed on ITT. Specifically, the April 13 letter's use of the phrase "recently discovered" was designed to create -- and did create -- the impression that ITT NV had complied with the pertinent ITAR regulations by reporting the consignment license violations near the time of their discovery. The government's subsequent criminal investigation, however, revealed not

only that ITT NV had not discovered the consignment license violations near the time of the April 13 letter, but that a number of ITT NV employees and managers were in fact aware of some of the consignment license violations since at least the mid-1990s. In fact, by May 17, 1998 -- more than two years before submission of the April 19, 2000 letter -- an extensive and detailed list of "PAST DUE CONSIGNMENT EQUIPMENT" had already been compiled and circulated to at least *27* ITT NV managers and employees from most of ITT NV's major departments. A second such memorandum, dated April 28, 1998, listing an additional 35 specific night vision consignments that had not been returned in a timely fashion was also widely circulated within ITT NV. Some of the consignment licenses listed in the memorandum had expired as far back as November 1990.

62. As importantly, the criminal investigation revealed that ITT managers and counsel for ITT Defense were discussing whether and when to disclose the consignment license violations to the government as far back as at least the summer of 1999. The evidence obtained by the government established that the Law Firm and counsel for ITT Defense intentionally delayed the disclosure of the myriad consignment license violations until they had completed their own investigation. Moreover, the government investigation revealed that in March 200 counsel for ITT Defense was specifically informed that ITT NV employees had been aware of the consignment license violations at least as early as March 17, 19<u>98</u>. Despite this knowledge, counsel for ITT Defense did not correct the false statement in the April 13, 2000 letter that ITT had only "recently discovered" the consignment licensing violations.

63. During an April 17, 2000 meeting called to review a draft of what would become the May 19 letter to ODTC, the Law Firm (which was drafting the disclosures) and counsel for ITT Defense were specifically informed that ITT NV had been aware of the consignment license violations since at least March 17, 1998. The words "recently discovered," however, remained in the draft until ITT Defense's top export compliance manager argued that use of the phrase "recently discovered" was false and misleading. Then, and only then, were those words removed from the draft letter. Moreover, the Law Firm made no effort, then or at any other time, to inform the government that the phrase "recently discovered" used in the April 13 letter was false and misleading. In fact, the Law Firm, joined by counsel for ITT Defense, speficicially argued against telling the government about the March 17, 1998 discovery date. Even when ITT Defense's top export compliance manager argued that it was a material omission not to inform the government of the March 17, 1998 discovery date, the outside attorneys at the Law Firm continued to argue that ITT should not raise the issue because, "no matter how you slice it," the failure to disclose the consignment license violations for years after their discovery would make ITT look really "sloppy." Neither ITT nor its counsel ever disclosed the March 17, 1998 discovery date to the State Department, or the fact that the "recently discovered" language in the April 13 letter was false and misleading.

64. The government's criminal investigation also revealed that ITT's statement in the May 19, 2000 letter that "[u]pon realizing that it had a compliance issue with respect to these temporary exports, ITT took corrective action" was false and misleading because

26

few if any of the corrective actions specified in the May 19 letter had taken place, not only in the mid-1990s, but even by March 17, 1998, the date of the "PAST DUE CONSIGNMENT EQUIPMENT" memorandum. Despite the fact that many people at ITT NV were aware of the consignment license violations by at least March 1998, ITT took virtually no significant corrective action in this regard until the summer of 1999, when a small group of ITT NV employees was tasked with attempting to locate and recover the missing night vision equipment -- a task they could not perform because ITT give them no meaningful resources or support. All of the other so-called "corrective actions" listed in the May 19 letter did not take place -- or, if they took place at all, did not occur until very near the April-May 2000 time period.

65.     For example, ITT purported to hire an export license manager, as part of the May 19 letter's solution to "ensure that similar issues do not recur." But he was given virtually no resources to accomplish the mission of export compliance. Within two months he had quit, stating in his resignation letter, "I knew when accepting the job that Night Vision had many problems, but as things have now turned out the problems are greater than anyone could imagine."

### Export Violations to a Singapore Company

66.     Since the 1980s, ITT NV has purchased almost all of its night vision optical assemblies from a company located in Singapore (Singapore Company). Throughout the course of the relationship, ITT NV worked collaboratively with the Singapore Company on a wide variety of different optical designs. This typically involved ITT NV's routine

27

provision of export-controlled technical specifications and drawings, which the Singapore Company would work on, in conjunction with ITT NV engineers, to design and create the required optical and related mechanical designs. After production and testing of the prototype optical assemblies, ITT NV purchased the finished optical assemblies from the Singapore Company.

  A. **Pre-September 2000 Export Violations**

  67. Despite knowing that the transfer of export-controlled technical data, including specifications and drawings, was illegal without a State Department export license, ITT's executives failed to obtain any export license authorizing transfer of technical data from ITT NV to the Singapore Company until October 24, 1994. Between October 24, 1994 and April 2, 1999, ITT's executives NV submitted applications for and obtained three limited export licenses (DSP-5 License for Permanent Export of Unclassified Technical Data) permitting transfer of certain specifically identified export-controlled drawings. In submitting its applications for these licenses, ITT's executives violated the law by falsely claiming that the shipment of the drawings listed in the licenses was a "completely new shipment," when in fact ITT NV had illegally transferred many of the same drawings to the Singapore Company before the license applications were even submitted.

  68. Even after ITT NV obtained the three specific export licenses, it continued to violate the law by transferring to the Singapore Company export-controlled technical data not covered by the limited export licenses. In addition, ITT violated the restrictions

and provisos that the State Department placed on the licenses. For example, the licenses limited the exports to "build to print" technical data, *i.e.*, "producing an end item. . .from technical drawings and specifications (which contain no process or know-how information) without the need for additional technical assistance" (quoting ITAR). The symbiotic relationship between ITT NV and the Singapore Company, however, far exceeded the "build-to-print" relationship authorized by the licenses. Thus, two of the export licenses required ITT NV to execute purchase orders with the Singapore Company that contained detailed and specific limitations on what the Singapore Company could and could not do with the sensitive documents transferred thereunder before procuring any product from the Singapore Company. Despite the fact that ITT NV procured tens of millions of dollars of products from the Singapore Company while the licenses where in effect, ITT NV failed to include the required statements of limitations in any of their purchase orders from the Singapore Company, and, though required to do so, failed to file any of the purchase orders with the State Department.

69.   By early 2000, a number of ITT NV managers and employees were aware that the Company was violating ITAR by exporting controlled documents, services, and information to the Singapore Company without a license and by violating the limitations of the export licenses it had obtained. In the face of ITT NV's impending disclosure to the State Department of its violation of ITAR consignment license rules, the Company decided to seek State Department approval for a Technical Assistance Agreement (TAA) that would allow the Company to share specifically identified export-controlled technical data

29

and services with the Singapore Company. In March 2000, an ITT NV employee was tasked with preparing a draft TAA for submission to the State Department. This employee was informed by his manager, John Doe defendant Manager B (Manager B), who was ITT NV's main contact with the Singapore Company, that ITT NV was only now applying for a TAA because of "the recent heightened controls," and that "there had been specific requirements on the previous licenses. . .that had not been followed."

70.     After learning this information, the employee alerted higher level ITT personnel at ITT Defense, including counsel for ITT Defense. Despite this alert about the systemic and continuous export violations involving the Singapore Company, legal counsel for ITT Defense decided that ITT was "not in a position to make a disclosure about this issue" given the fact that ITT was about to disclose numerous ITAR consignment license violations. ITT decided not to inform the State Department of the Singapore Company-related export violations. In fact, it was not until 2004, when ITT NV was preparing to reveal a series of violations relating to the ITT NV/Singapore Company TAA, that ITT gave the government even a hint of these violations. The full extent of the export violations was revealed only during the government's criminal investigation.

### B.     Post-September 2000 Export Violations

71.     ITAR requires that a TAA provide information "in terms that are as precise as possible," and that all defense articles including technical data such as drawings and specifications designed for export be "described by military nomenclature, contract number, National Stock number, nameplate data, or other specific information." ITAR also

requires that a TAA applicant make a statement in the transmittal letter accompanying the TAA "identifying the U.S. Government contract under which the equipment or technical data was generated, improved, or developed and supplied to the U.S. Government, and whether the equipment or technical data was derived from any bid or other proposal to the U.S. Government."

72.  In preparing a draft of the TAA, ITT NV employees put together an Annex to the TAA (TAA Annex) containing a list of specific drawings and specification numbers for the documents they wished to export to the Singapore Company pursuant to the anticipated TAA. Significant efforts were expended to ensure that the TAA Annex was as complete as possible because everyone involved in the process understood that only specifically listed documents (and their updates/revisions) would be able to be exported pursuant to the TAA if it was approved as submitted. A copy of each of the specified drawings and specifications listed on the TAA Annex was attached to the TAA for review when ITT NV submitted it to the State Department for approval on May 10, 2000. ITT made it clear that the documents that would be transferred were limited to three specific night vision systems, specifically, the PVS/7, the PVS/14, and the ANVIS night vision systems. Moreover, the TAA Annex made clear that ITT NV was requesting permission for a limited "build-to-print" type of relationship with the Singapore Company, stating in relevant part, "No manufacturing or process data will be provided to. . .[the Singapore Company] under the TAA.

73.  The State Department approved the TAA request in a letter dated September

11, 2000, imposing a series of very restrictive limiting provisos. Among these were provisos that expressly did *not* authorize (a) the shipment of hardware; (b) the release or offering of manufacturing technology, systems optimization/integration know-how, or design know-now; and (c) any production without an approved manufacturing license agreement. The State Department added these restrictive provisos in an attempt to limit what ITT NV could do under the TAA because (a) the night vision technology was extremely sensitive and (b) Singapore was a well known conduit for the transfer of military technology to the People's Republic of China, a prohibited destination. The State Department expected that ITT NV would share the documents, but only the documents, listed in the TAA Annex, explore the possibility of a limited relationship with the Singapore Company, and then come back to the State Department for explicit approval if ITT NV wished to engage in any of the activities outlined in items (a) through (c) above. After receiving the State Department's approval/limitation letter, and ITT NV Manager signed the TAA on behalf of ITT on September 18, 2000. Once he received a copy of the signed TAA and the approval/limitation letter, the Managing Director of the Singapore Company signed the TAA on September 22, 2000, thereby making the TAA effective as of that date.

74. ITT NV proceeded to ignore the limitations built into the TAA and the State Department restrictions placed on the TAA. ITT NV continued to export export-controlled drawings and specifications to the Singapore Company that were not covered by the TAA or any export license, exactly as if these restrictions and provisos did not exist. ITT NV

also violated the TAA provisos by shipping hardware to the Singapore Company and by producing millions of dollars of product without authority. In a letter dated December 19, 2003, ITT admitted to the State Department that it had been in production for years with the Singapore Company, in direct and continuous violation of the "no production" proviso. The December 19 letter stated that it would not supply night vision goggles to the military unless the "no production" proviso was lifted. Faced with the military's need for night vision goggles during an ongoing war, the State Department lifted this proviso.

**Illegal Export of Classified Information; Export Violations Relating to the LIF**

**A.    Background**

75.    Night vision technology is critical to the military's war-fighting capabilities, and having the most capable night vision systems gives U.S. combat military personnel a critical battlefield advantage over the enemies of the United States. To preserve this advantage, the military pays close attention to weapons that might damage, degrade, or destroy night vision equipment on the battlefield. One of the battlefield threats to night vision equipment is laser weapons, certain of which are effective against such equipment. To prevent damage or destruction of night vision equipment that might leave a pilot or soldier night-blind at a crucial moment on the battlefield and result in his death, the U.S. military has developed laser countermeasures, one of which is an optical addition to night vision equipment called a light interference filter (LIF). The LIF is composed of an underlying glass lens (substrate lens) coated with a series of specialized coatings that is mounted in a metal housing.

76. Because of LIF's critical nature and the sensitivity of the technology involved, the government classified certain portions of the written specification for the LIF as Secret. The classified LIF specification is so sensitive that it is not only classified as "Secret" but, pursuant to the March 7, 2000 "Security Classification Guide for Laser Protection Material," was also given the special designation "NOFORN" (No Foreign). This designation means that the classified LIF specification cannot be shared with *any* foreign country, including the United States' closest military allies. In addition to the classified LIF specification, all LIF drawings are export-controlled and may not be exported without a State Department license.

77. Even if the classified LIF specification did not carry a "No Foreign" designation that prevented its export to any country without exception, obtaining the necessary verification of clearance and proper government authorizations for an export of classified material is a cumbersome and enervating process, a process which is necessary to prevent the damage to national security that is likely to occur from disclosure to an unauthorized or uncleared foreign person or entity. The National Industrial Security Program Operating Manual (NISPOM) sets forth specific and detailed requirements that govern the potential export of such materials, and these, plus ITAR, must be followed, with no exceptions allowed, before any classified document may be exported to a foreign person or entity. At a minimum, the following basic steps must be taken: (a) contact the Defense Security Service Industrial Security Representative (DSS ISR) to inform that office of the desire to export classified material; (b) verify with DSS ISR the proper procedures to

34