follow; (c) review the current Security Classification Guide (DD 254) for the classified material to verify the exact level of classification and determine whether there are any special classifications; (d) contact the Government Contracting Agency (GCA) to obtain its agreement and approval to export the classified material to the proposed foreign recipient; (e) contact the Cognizant Security Agency (CSA) "at the earliest possible stage in deliberations that will lead to the international transfer of classified material," and obtain CSA's agreement and written approval to export the designated classified material to the proposed foreign recipient; (f) contact the Defense Industrial Security Clearance Office (DISCO) to obtain written verification that the intended foreign recipient has the proper clearance, classified storage capability, and classified handling procedures in place; (g) submit an application to export classified data to the State Department's Office of Defense Trade Controls (ODTC) for approval, and obtain ODTC's written approval and limitations; (h) prepare written transmission instructions for export of the classified materials, and submit them to the CSA for approval; (i) coördinate with the CSA the identification of the Designated Government Representative (DGR) for the United States and the identification of the DGR of the government of the foreign recipient's country who will carry out the mandatory government-to-government transfer of the classified materials; and (j) prepare the necessary paperwork and packaging for visual review and verification by the U.S. DGR before export.

78.    If all steps set forth in the preceding paragraph have been successfully completed and all necessary coördination, verifications, and authorizations have been

obtained, a foreign shipment of classified material may take place only through government-to-government channels. Exactly as is the case with registered mail carried by the Postal Service, a continuous chain of written receipts reflecting all transfers must be meticulously maintained throughout the entire government-to-government export process.

**B.    Illegal Export of Controlled LIF Drawings**

79.    In 1999 the LIF's for ITT NV's equipment were manufactured by an American company located in California (California Company) under a sub-contract with ITT NV. In an effort to reduce its costs and thereby increase ITT's profits, Manager B applied pressure to the California Company to lower the price of the LIF (target price). In response, the California Company explored the possibility of using a company located in the People's Republic of China to manufacture the LIF's substrate lens because manufacturing and labor costs in China are substantially lower than elsewhere. On July 23, 1999, the California Company applied for an export license to send the drawing for the LIF substrate lens to a company located in Shanghai. Not surprisingly, the State Department rejected this application on August 16, 1999 for reasons of "National Security" because "China is a prohibited destination pursuant to ITAR."

80.    On February 17, 2000, the California Company sent Manager B an e-mail stating that one of the main reasons it was having problems meeting the target price was because the State Department had denied it permission to manufacture the LIF substrate "off-shore." On week later, on February 24, the license application and the State Department's letter denying the California Company's request to manufacture the LIF

substrate lens in China were faxed to Manager B. Manager B subsequently recommended that the California Company explore using the Singapore Company to manufacture the LIF substrate lens. In response, the California Company sent an e-mail to the Singapore Company to obtain a price quote. Not realizing that the request had originated with ITT NV, the Singapore Company declined to provide a price quote on the ostensible ground that their "capacity" was "fully over loaded." After learning that the Singapore Company had declined to provide a quote, Manager B sent an e-mail to a high-level manager at the Singapore Company on February 28, 2000. The February 28 e-mail stated in pertinent part: "I was both surprised and disappointed that you were to [sic] busy to take on more business!? I would have offered [the Singapore Company] the opportunity to quote the whole LIF assembly but, because the coating is US Government Classified it can not go off-shore." Reversing its "fully over loaded capacity" position, the Singapore Company immediately responded that because this was in reality a project for ITT NV, it could "take on more job." The Singapore Company subsequently provided the California Company with a favorable quote to manufacture the LIF substrate lens.

81. Despite receiving a favorable quote from the Singapore Company, the California Company notified Manager B on March 27, 2000 that the "financial performance" of the LIF manufacturing program was "very, very poor," and that the California Company would need to increase the price that it was charging ITT NV for the LIF. The California Company also stated that it would understand if ITT NV decided to get another supplier for the LIF. On August 17, 2000, Manager B informed the California

37

Company that ITT NV was exploring the possibility of using other suppliers and that ITT NV had gotten a favorable quote from another company. On October 9, the California Company informed Manager B that it was probably going to transfer all its "coating work" to its U.K. facility. After discussing and agreeing that the classified specification for the LIF could not be transferred to its U.K. facility, Manager B indicated that ITT NV would probably "want to do a last-buy to cover [their] future needs." On October 16, 2000, the California Company sent Manager B an e-mail confirming that it had decided to transfer the coating business to their U.K. facility, and that it needed to know "ASAP" the "quantities and time-frame" for a "last-and-final buy from" the California Company. The e-mail also stated that, "Your [LIF] coating, being classified, can't be transferred as we recently discussed." In response, on October 18 Manager B told the California Company that ITT NV wanted to "add-on 4,000 additional pieces to their Dec. Delivery as their last-and-final buy." When, on November 6, 2000, the California Company informed ITT NV that the price for the add-on to the "last-and-final buy" was "$120K more than they would have paid with our old price," Manager B asked for "30 days to see if they can get someone else to take up this program since they are ultimately going to have to get someone to do it anyway." Manager B also indicated that they had gotten quotes from two other companies to manufacture the LIF.

82.    Despite the fact that ITT NV had received quotes for the production of the LIF from two other companies, by the end of March 2001 Manager B had still not arranged for a replacement for the California Company. Manager B's delay in identifying a new

38

manufacturer of the LIF's was quickly building to a crisis.  As Manager B explained in an

April 1, 2001 e-mail to the Singapore Company, "[t]his issue is becoming critical for me.  I

will need new parts by June-July timeframe.  My third new source just quoted me (after a

month delay) with a 10 month lead time."  In fact, the crisis became so acute that by the

end of May 2001, ITT NV had to ask the Army for permission temporarily to store night

vision equipment intended for delivery to the Army in a warehouse until ITT NV was able

to supply the required LIF's.

83.    Despite being fully aware that the classified specification for the LIP could

not be exported, in his April 1, 2001 e-mail Manager B asked whether the Singapore

Company could manufacture the LIF for ITT NV.   In his effort to find a new LIF

manufacturer, Manage B ignored the ITAR requirements -- which requirements he was

completely conversant with -- and illegally faxed to the Singapore Company a "drawing

package" for the LIF  without obtaining a State Department license or notifying anyone in

the government.  Moreover, when he illegally exported these controlled LIF drawings to

the Singapore Company, Manager B made no effort to ensure that the Singapore Company

was aware of the sensitive nature of the drawings or the precautions the Singapore

Company was obliged to take in handling them.

84.    On April 3, 2001, Manager B again intentionally violated the law by

electronically exporting to the Singapore Company by e-mail additional export-controlled

LIF drawings without obtaining an State Department export license.  As before, Manager B

made no effort to ensure that the Singapore Company was aware of the sensitive nature of

the drawings or the precautions the Singapore Company was obliged to take in handling them.

### C.    Illegal Production of the LIF Substrate in the People's Republic of China

85.    When the Singapore Company received the LIF drawings package it prepared an export-controlled derivative LIF drawing based on the illegally exported LIF drawings.  Given that Manager B had made it pellucid that the LIF's cost had to be "very competitive," and since he had previously recommended that the Singapore Company use its "facilities" located in "China," the Singapore Company exported the controlled derivative drawing to an optics company located in the People's Republic of China, a prohibited ITAR destination.  The Singapore Company also issued an order for the production of thousands of LIF substrates.  With the export-controlled derivative LIF substrate drawing and the purchase order in hand, the Chinese optics company quickly began production of the LIF substrates in China.  Ultimately, the Chinese company manufactured thousands of the LIF substrate lenses.

86.    While arranging for the production of the LIF substrate, Manager B also turned his attention to the issue of coating the LIF substrates.  Because the Singapore Company was incapable of performing the coating work, Manager B, at its suggestion, turned to a sister company of the Singapore Company located in the U.K. to do the LIF coating work.  Because the Singapore Company had already sent a copy of the export-controlled LIF drawing the U.K. company, Manager B turned his attention to providing a copy of the classified LIF specification to the U.K. Company.

**D.**    **Illegal Export of the Classified LIF Specification**

87.    On April 2, 2001, Manager B sent an e-mail to another ITT NV manager explaining the problems he was having finding a new LIF supplier. In his e-mail, Manager B explained that the "LIF specification is very demanding and worse, *it is a classified specification which prevents us from going to off-shore coating suppliers.*" (emphasis added). In response to this e-mail, the other manager contacted a government employee who worked at the Army Night Vision Lab to see if there was any way that ITT NV might be able to use an "off-shore coating supplier." On April 6, 2001, the other manager informed Manager B and others at ITT NV that the government employee he contacted stated that using an "off-shore" coating supplier would be "a long road or tough to do." Despite his knowledge that the classified LIF specification could not go to an "off-shore coating supplier," that it could not go to the U.K., and that any attempt to get the government's permission to go "off-shore" would be "a long read or tough to do," on April 6, 2001, Manager B sent an e-mail to the Singapore Company asking for the "name and e-mail/telephone # of the security officer" at their U.K. sister company so he could "expedite the transfer of the [classified LIF] specification" to the U.K. company.

88.    To obtain a copy of the classified LIF specification, Manager B contacted another ITT NV manager, John Doe defendant Manager C (Manager C), who had access to the classified information. After explaining to Manager C the pressing need to send the classified information to the U.K. company, Manager C made an effort to locate a copy of the classified LIF information. When he was unable to find a copy of the classified LIF

41

specification in the ITT NV classified safe or elsewhere, Manager C contacted the Army to

obtain a new copy. During his contact with the Army, Manager C made no mention of the

fact that the Company intended to export the classified information to the U.K. On April 5,

2001, the Army sent a copy of the classified information to ITT NV based on the trust and

confidence it reposed in Manager C and in ITT NV.

89.    In addition to obtaining a copy of the classified LIF specification, Manager

C also contacted ITT NV's government DSS ISR to obtain a contact number for DISCO,

which contact numbers the DSS ISR provided to Manager C on April 9, 2001. Despite the

fact that Manager C and the DSS ISR worked with each other routinely, and the DSS IRS

would have been the primary government person to consult about transferring classified

information to foreigners, Manager C never mentioned that the Company intended to

export the classified LIF specification to the U.K. On April 10, without the DSS ISR's

knowledge, Manager C contacted the section of DISCO responsible for confirming whether

a foreign company or person has a security clearance and asked whether the U.K. Company

located at a specified U.K. address had a security clearance. In addition, at Manager B's

request, on April 10, 2001, Manager C contacted the U.K. Company's security supervisor

to "verify the clearance level of your facility."

90.    On April 17, 2001, the U.K. Company sent an e-mail to Manager C

informing him that they had been unable to find a copy of the classified LIF specification,

and instructing him to send the it to their sister company at a different U.K. address, since

"[t]hey are cleared to receive classified materials." Manager C forwarded this e-mail to

42

Manager B, and also informed him that after he received the U.K. Company's e-mail he had contacted DISCO to determine the status of the request to verify the U.K. Company's security clearance. Manager C further informed Manager B that the government had "just received appropriate documentation per our request and are currently confirming." Manager C concluded by stating that it "[m]ay be another day or so before I have official confirmation" by "fax." On April 18, DISCO sent a fax to Manager C informing him that a sister company with another U.K. address held a "SECRET/NATO SECRET" clearance. The April 18 DISCO did not indicate that the U.K. Company itself had any type of clearance.

      91.    ITT NV had not obtained the government's permission to send the classified LIF specification to the U.K. Company or to any foreign entity or person. ITT NV had not received any government verification that the U.K. Company held an appropriate clearance. The U.K. Company -- and, separately, DISCO -- had indirectly informed ITT NV that the U.K. Company was not a cleared facility. ITT NV had not obtained a State Department license to export the classified LIF specification to the U.K. Company. And, the U.K. company had specifically instructed ITT NV to send the classified LIF specification to the U.K. Company's sister company at a different address. On April 2, Manager B had sent an e-mail in which he wrote, "*it is a classified specification which prevents us from going to off-shore coating suppliers.*" Despite all this, just 16 days later -- to wit, April 18, 2001 -- Manager C, at Manager B's direction, illegally sent through the U.S. Mail, in blatant and egregious violation of the NIPSOM and ITAR, the classified LIF

specification to the U.K. Company -- a facility without any clearance or authority to receive classified information.

**E.      Illegal Production of the LIF's**

92.      On April 21, 2001, the U.K. Company's managing director sent an e-mail to Manager B informing him that the U.K. Company had not yet received the classified LIF specification, stating that he was "concerned that it may be lost in either the U.S. or U.K. postal system." The next day, April 26, the U.K. Company received the classified LIF specification, which was delivered through the Royal Mail. The U.K. Company's managing director informed Manager B that he had sent the specification to a facility that lacked a security clearance. When the managing director asked Manager B what he wanted to do next, Manager B instructed him to open the package containing the classified LIF specification and prepare the requested price quotation for the manufacture of the LIF's.

93.      On May 22, 2001, after a number of uncleared U.K. Company employees had reviewed the classified LIF specification, the U.K. Company's general manager sent Manager B a price quotation for the manufacture of LIF's for delivery beginning in "late June/early July dependent on [U.K.] export license approval." On May 31, Manager B sent an e-mail to the U.K. Company stating, "[a]t this time we are planning on buying 24,000 pieces at 2000 per month with deliveries the first of each month. We will need the first production units for our August deliveries. We will need them here in time to complete the final assembly. I am hoping to be able to get your first article samples this month." On June 11, the U.K. Company's general manager sent an e-mail to the ITT NV Purchasing

44

Manager stating that the U.K. Company expected to have 20 LIF's ready to ship to ITT NV "this month."

94.    Despite the fact that the LIF substrates and the coated LIF's were well along their way to production, Manager B did not initiate any internal requests for the required export license applications with ITT NV's export control personnel until May 24, 2001. On that date, Manager B filled out an internal ITT NV form requesting, *inter alia*, a license to transmit to the U.K. Company some of the LIF drawings he had previously sent to the Singapore Company.  Manager B, however, did not indicate that the Singapore Company had itself sent at least one of these drawings to the U.K. Company and that the U.K. Company had used this drawing in preparing its price quotation.  Manager B also lied on the internal ITT NV application when he stated that the U.K. Company had been "cleared to accept" the classified LIF specification "through the DSS."  Finally, on June 8, 2001, an ITT NV export compliance employee directly asked Manager B whether the Singapore Company would "have access to the drawings at all."  She posed this question because she understood that if the Singapore Company had access to the LIF drawings, then ITT NV "should list them on the license too."  Despite the fact that Manager B had already illegally exported the same LIF substrate drawing to the Singapore Company without a license, he lied and told her that the Singapore Company would not have any access to the LIF drawings, and therefore would not need to be listed on the license application.

95.    On June 12, ITT NV submitted a license application to the State Department to export a LIF drawing (Drawing Number 273220) to the U.K. Company.  ITT NV falsely

indicated on the license application that the shipment of the LIF drawing was a "completely new shipment." Nonetheless, the State Department rejected the application on August 7, stating in relevant part: "The drawing is of no value without specifications. The specifications are classified as 'secret/no foreign.' Light interference filters [LIF] are the critical technology for electro-optical countermeasures systems for USG military/national security night vision systems. You have not justified why you want to purchase these components from a foreign source. If ITT Night Vision wants to pursue this offshore procurement, ITT Night Vision should obtain the concurrence of the Army, especially the Night Vision laboratory, before resubmitting." Despite the facts that (a) ITT NV had no export license in place to obtain LIF's from a foreign source and (b) it was submitting a license application to the State Department, ITT NV issued a purchase order for 20 LIF's on June 12, 2001.

96.    The next day -- June 13 -- an ITT NV employee mentioned, during a discussion with an Army Night Vision Lab employee, that ITT was obtaining LIF's from a foreign source. When the Lab employee inquired how ITT NV was able to do so, given the fact that the LIF specification was designated "No Foreign" (NOFORN), the ITT NV employee was unable to respond. DSS was notified of the compromise of classified information, leading the DSS ISR to tell Manager C to get the classified documents returned in a proper manner through government-to-government channels, *i.e.*, not using the Royal Mail or the U.S. Postal System. Accordingly, on July 3, Manager C sent an e-mail to the U.K. Company's General Manager requesting return of the classified LIF

46

specification, to which the General Manager responded on July 4, stating that the specification would be returned that day. Instead of being returned properly through government-to-government channels, however, it was sent back the way it had come -- through the U.K. and U.S. postal systems. Manager C signed a postal receipt for the return of the classified LIE specification on July 17.

97.    On August 22 and again on August 27, 2001, the State Department issued a written demand that within 30 days ITT provide a wide variety of information about ITT NV's violations relating to the classified LIF specification compromise, including the return of "All technical data (classified and unclassified) and/or defense articles sent to the U.K." Despite the State Department's demand for the return of the classified LIF specification, ITT failed to return it within the 30 day time limit.

98.    On March 1, 2002, ITT NV informed the State Department that it had turned over "all classified information requested." In light of the timing and substance of this response, the government obtained a search warrant to search for a variety of evidence, including the classified LIF specification. The search warrant was executed on October 29, 2002. During the search of ITT NV's classified safe conducted pursuant to the warrant, federal agents recovered the missing classified LIF specification that the U.K. Company had returned in July 2001.

99.    In addition to failing to return the classified LIF specification, ITT NV continue to push forward with the illegal foreign production of LIF's even though (a) it knew that it had illegally exported the LIF specification to the U.K. Company; (b) the DSS

47

ISR had demanded immediate return of the LIF specification; (c) the DSS ISR was conducting an on-going investigation of the compromise of the classified information; and (d) ITT NV had no export license for the foreign production of LIF's.  For example, on July 6, 2001, ITT NV issued a second purchase order to the U.K. Company for the manufacture of 20,000 LIF's for delivery beginning August 1, 2001.  Even when Manager B learned that the U.K. Company had retained a copy of the LIF specification after it had claimed to have returned it, Manager B continued to press ahead with the manufacturing process, and even provided direct assistance to the U.K. Company.

100.    By way of example, on July 30, the U.K. Company's Product Assurance Manager sent an e-mail to an ITT NV employing stating, "Can you help clear up one issue on the LIF filters.  There is a discrepancy between the spherical power specification in the Mil spec and your drawing.  As per the detail of the Mil spec this document should take precedence, however can you confirm that this is correct.  Thank you for your assistance." After obtaining the answer from Manager B, the ITT NV employee replied, "[t]he Mil. Spec. takes precedent [sic]."  ITT NV never told the government that the U.K. Company had retained a copy of the classified LIF specification, and the government has to this day been unable to recover the copy that the U.K. Company made.

101.    It was not until August 9, 2001 that ITT NV asked the U.K. Company, at the government's specific direction, to halt LIF production.  By that date the U.K. Company had delivered 20 completed LIF's to ITT NV, had manufactured 518 LIF's that passed testing standards, and had generated a significant amount of new classified test data related

48

to testing LIF's.  It was not until February 6, 2002 that ITT NV finally put the LIF purchase

order on "hold indefinitely" status.  By that time, the U.K. Company had produced at least

1000 coated LIF filers, and the Singapore Company had manufactured as many as 20 LIF

substrates in China.  Many of these LIF's and LIF substrates have never been recovered,

and all of them could  wind up in the hands of America's battlefield enemies.

### Export Violations Relating to the Enhanced Night Vision Goggle System

### A.    ENVG Background

102.    In July 2000, the Army awarded a development contract to ITT NV and

several other U.S. defense contractors to study the area of helmet-born night vision

technology.    The study contract made clear that the Army was looking for a

"[r]evolutionary approach (versus evolutionary)" towards the development of a night vision

goggle that would replace the night vision goggles in production at that time.    (A

Hollywood-based example of 1990s night vision goggle technology can be seen in the

1992 Harrison Ford movie *Patriot Games* where, in the movie's final scenes, the splinter-

group IRA faction that has been trying to take down Ford's character Jack Ryan invades

his house on the Eastern Shore of Maryland while wearing a 1990s ENVG system.)

103.    The contract was divided into two phases.  In phrase one, ITT NV was

obligated to produce a report that set forth and evaluated "conceptual designs" for an

Enhanced Night Vision Goggle (ENVG).  In phase two, ITT NV was to develop, build, and

test "prototype ENVG units."  The Army awarded ITT $1,843,000 over the life of the

initial development contract.

104.    Phase One of the initial development contract concluded in December 2000. The Army evaluated the reports submitted and decided to move forward on a "revolutionary" night vision goggle system. This new ENVG system would combine the strengths of night vision technology with the strengths of thermal imaging technology. The Army hoped to give its soldiers a distinct battlefield visual advantage by optically blending the two systems' visual images into one system and one image. If successfully developed, not only would American soldiers be able to see in the dark, but they would also be able to see through smoke, clouds, and other obscurants, an advantage that could mean the difference between life and death on the battlefield.

**B.    Pre-2002 Illegal ENVG Exports to Singapore**

105.    In 2001, the Army moved forward with phase two of the development contract and requested the production of several different ENVG prototypes from several defense contractors, including ITT NV. ITT NV turned to the Singapore Company to produce an ENVG prototype. The Singapore Company thereafter assigned a Singaporean optical designer to work on the ENVG contract. Without obtaining any of the necessary export licenses, ITT NV and the Singapore Company began to work collaboratively on the design and development of the ENVG prototype. In connection with this joint development work, ITT violated ITAR by shipping export-controlled drawings to the Singapore Company without having first obtained the required export licenses. ITT NV even brought the Singapore Company's optical engineer to the United States to work side-by-side with his ITT NV counterpart inside ITT's Roanoke, Va. facilities without notifying or getting any type of approval from the State Department.

106.    After conducting tests on the ENVG prototypes that the defense contractors

50

involved in the ENVG competition delivered to the Army, the Army, towards the end of 2001, made of series of technology selections and awarded additional money through a second development contract for the development, production, and testing of additional ENVG prototypes.    The Army gave ITT NV $1,204,000 pursuant to this second development contract.    When the second contract came to an end, the Army gave ITT NV an additional $4,175,000 in 2003 pursuant to a third ENVG contract.    In total, ITT NV received $7,232,000 from the Army during the developmental phase of the ENVG program.

107.    The Singaporean optical engineer who had worked with ITT NV during the development of the first ENVG prototype left the Singapore Company during the summer of 2001.    ITT NV therefore turned to a group of optical designers employed by the Singapore Company to work collaboratively with ITT NV engineers to develop the next ENVG prototype.    Again, however, ITT NV failed to obtain the necessary export licenses from the State Department.    Among the Singapore Company optical engineers who were collaboratively working with ITT NV on ENVG design and development were two who were Chinese citizens, even though China was a prohibited destination for export-controlled information.    The Chinese optical engineers routinely enjoyed access to export-controlled drawings and specifications until 2003, when they left Singapore and returned to China.    Moreover, ITT NV routinely shipped export-controlled ENVG drawings and specifications to the Singapore Company without a State Department license throughout the developmental phase of the ENVG program.    ITT NV's disregard of ITAR during the

developmental phrase was harmful to the interests of the United States: as an ITT NV optical engineer stated in an e-mail discussing the need to protect the ENVG system's optical design, "[b]y knowing the optical train of the ENVG. . .they can determine how the whole system works."

108.    Some managers at ITT NV were personally aware that the Company was working collaboratively with, and sharing export-controlled drawings with, the Singapore Company without an export license. Nonetheless, no effort to obtain such a license was considered until September 2002. At the request of an ITT NV manager, John Doe defendant Manager D (Manager D), ITT NV engineers prepared a draft of an amendment to the ITT NV/Singapore Company TAA for submission to the State Department. This draft agreement listed 20 specific export-controlled drawings by number that "ITT and [the Singapore Company] need to trade information on" that were not listed on the TAA Annex. Thirteen (13) of the listed drawings related to night vision goggle systems in production, and the remaining 7 drawings related to ENVG "optical assemblies used on systems being developed." The draft amendment also made clear that ITT NV and the Singapore Company had worked collaboratively on the design of export-controlled night vision optics "*since the 1980s*." Submission of the amendment would have informed the State Department that not only was ITT NV illegally working with the Singapore Company on the design and development of the highly sensitive ENVG system, but also that *ITT NV had been illegally working with the Singapore Company for more than 20 years*. Given the immediate and obvious implications of revealing this information to the State Department,

ITT NV never submitted the draft amendment.

109.    In the summer of 2003, ITT NV became so concerned about its relationship with the Singapore Company that it decided to stop working with it on future ENVG designs. Instead, ITT NV began a search for an American partner which it could legally work on future ENVG designs. After a selection process, ITT NV selected an American company (American Company) to take the Singapore Company's place in the design of future ENVG optics. The American Company, with the assistance of other American companies, eventually redesigned the entire "optical train" for the ENVG system.

110.    By the end of 2003, Manager D was openly informing other ITT NV employees that the Company did not have a license to export ENVG documents to the Singapore Company, and that the Company needed to obtain an amendment to its existing technical assistance agreement if it wished to continue to "undertake detailed design collaborative efforts for ENVG optics." ITT NV needed to continue to work with the Singapore Company with regard to production of the existing prototype ENVG design for delivery to the Army. In July 2004, therefore, Manager D once again asked an ITT AV engineer to draft an amendment to the existing ITT NV/Singapore Company TAA for submission to the State Department. This amendment, like the previous one, was never submitted because it would never have received State Department approval. Despite the clear understanding that ITT did not have a license to export ENVG drawings and specifications, Manager D continued to authorize ITT NV personnel routinely to export controlled drawings and specifications in violation of ITAR. With the full personal

53

knowledge of ITT NV management, ITT NV personnel even went to the extreme of exporting to the Singapore Company, on February 27, 2004, the most up-to-date export-controlled ENVG performance specifications, including information related to the pertinent thermal optics, a highly sensitive part of the ENVG system that the Singapore Company had no responsibility for and which it never worked on. ITT NV decided to export these latest ENVG performance specifications to the Singapore Company so that it would be ready to assist ITT NV when it came time for full production of the ENVG optical components and assemblies in 2006.

### C.    Post-2004 Illegal ENVG Exports to Singapore

111.    With the knowledge that ITT NV was routinely violating ITAR requirements, in 2003 Manager D and other ITT NV managers began looking for a way to circumvent sending export-controlled ENVG technical data *directly* from ITT NV to the Singapore Company, as well as for a way to shift the legal responsibility for the export of ENVG technical data to someone else. On February 23, 2004, Manager B, with the knowledge of Manager D, wrote an e-mail to the Singapore Company stating, "I am sorry to say that I am extremely disappointed in the efforts so far to establish a domestic U.S. operation and specifically to find an optical engineer. We are continuing to falter here in our efforts to re-design the ENVG optics while complying with U.S. export regulations. This is forcing us to consider finding a U.S. domestic source for ENVG optics and future optical assembly's [sic]."

112.    Manager B went on to say that if the Singapore Company ". . .did find a

domestic engineer, that person would have to be employed by a [Singapore Company parent]. . .division that was incorporated in the U.S. (*i.e.*, [. . .] Rochester).  If the engineer were employed by . . .[the Singapore Company] then they would be considered a foreign national no matter what their citizenship."  In response, the Singapore Company hired an optical engineer who was a U.S. citizen (John Doe defendant American engineer, or American engineer) and attached him to a sister company located near Rochester, N.Y. (Rochester Company).   The Singapore Company was willing to do this for ITT NV because ITT NV was its largest customer.  The loss of ITT NV's business to a domestic U.S. competitor, as threatened in Manager D's e-mail, would have had an enormous negative impact on the Singapore Company and its sister companies.

113.    On June 10, 2004, Manager B and Manager D met with the management of the Rochester Company and others to discuss shifting responsibility, to the Rochester Company, for the export of ITT NV ENVG technology to the Singapore Company.  During the meeting, Manager B and Manager D explained that ITT NV was developing the "next generation" of night vision equipment, called ENVG.  Manager D stated  that while ITT NV had a TAA with the Singapore Company, that TAA did not cover ENVG.  Manager D also stated that ITT NV believed that the State Department would disapprove an amendment to the TAA that would cover ENVG.  ITT NV, therefore, proposed to share ENVG-related technical data with the American optical engineer hired by the Singapore Company, who was attached to the Rochester Company.  Under this scenario, it would be the Rochester Company rather than ITT that would be responsible for exporting any

export-controlled technical data to the Singapore Company. Manager B made it clear that if the Rochester Company did not agree with this proposal, ITT NV would take its business elsewhere. Despite the facts that the Rochester Company (a) was not involved in the development or production of night vision equipment; (b) had virtually no experience with the export of controlled technical data; and (c) did not employ anyone who had even a basic working knowledge of ITAR's requirements, it ultimately agreed to ITT's proposal because ITT NV was such a critical customer.

114.    Before the June 10 meeting, the Rochester Company had submitted a request for a TAA between itself and its Singapore sister company (Rochester/Singapore TAA). In that May 14 request, the Rochester Company applied for an export license to provide "services to design and develop optical components, optical assemblies, and opto-mechanical assemblies for use in defense products like night vision equipment." The request further requested permission for the Rochester Company to share its designs with the Singapore Company to enable the Singapore Company to manufacture the Rochester Company's designs on a "build-to-print" basis in Singapore. The State Department approved the Rochester/Singapore TAA on June 29, 2004, with a series of limitations. The TAA became effective on January 4, 2005, when the Rochester Company's president signed it.

115.    After the Rochester/Singapore TAA became effective, the American engineer attached to the Rochester Company sent a copy of the TAA, the TAA transmittal letter, the State Department's approval letter, and other documents related to the TAA to

Manager D for his review. Despite the facts that (a) Manager D knew that the technical data to be exported under a TAA was required to be identified, which in this case it was not; (b) the Rochester /Singapore TAA did not list any ENVG drawing or specification, or even mention ENVG or ITT at all; and (c) the transmittal letter never mentioned any of the ENVG contracts as contracts under which the technical data to be exported was developed, on February 2, 2005, Manager D sent an e-mail to Manager B as well as to the U.S. engineers and others stating that he had reviewed the Rochester/Singapore TAA and that "the TAA appears to satisfy our requirements for establishing a U.S. sourced *lens design operation* to interface with [the Singapore Company] in Singapore." (emphasis added)

116.    In reliance on Manager D's February 2, 2005 e-mail, ITT NV engineers began freely to share export-controlled ENVG technical data, including drawings and specifications, with the American engineer. The American engineer, however, soon learned that the ENVG optical designs on which the Singapore Company had previously worked were obsolete, and that a new American company had resigned the ENVG optics. Despite the fact that  the Rochester/Singapore TAA was limited to the export of designs created by the Rochester Company, the first thing that ITT NV asked the American engineer to export to the Singapore Company was an ITT specification and drawing for a "Special Night Vision Goggle" (SNVG) beam combiner for a manufacturing quote for as many as 500 beam combiners in 2005 and for "10,000/year for 2006 and beyond."

117.    The ITT NV engineers made it clear that they did not want the American engineer to work on either the design or the drawing of the SNVG beam combiner. In fact,

the American engineer was not qualified to work on the design of a beam combiner. ITT NV merely wanted the American engineer to act as a conduit for the export of ITT's SNVG beam combiner specifications and drawing. In order to hide the fact that the SNVG beam combiner specification and drawing really comprised the latest and most up-to-date specification and drawing for the ENVG beam combiner, an ITT NV engineer replaced all references in the ENVG beam combiner specification with the fictitious name "Special Night Vision Goggle," or "SNVG," before giving it to the American engineer for export to the Singapore Company.

118.    Before he exported ITT's "SNVG" to the Singapore Company, the American engineer felt it appropriate to consult with Manager D because he himself had absolutely no experience with exporting controlled documents, and had had only two days of ITAR training from an introductory ITAR course. On March 1, 2005, after Manager D had given him specific permission to export the "SNVG" beam combiner specification and drawing, the American engineer sent the "SNVG" export-controlled documents to the Singapore Company by fax. In his transmittal letter to the Singapore Company, the American engineer stated that he believed that "these updated requirements are for the ENVG and that the term 'SNVG' *was used as a decoy*." (emphasis added)

119.    ITT NV's knowing use of a "decoy" specification was further illuminated in a subsequent conversation between Manager D and the American engineer. On March 7, 2005, the American engineer called Manager D to get his permission to export an electronic copy of the ENVG beam combiner drawing to the Singapore Company. During

58