the course of the conversation, Manager D asked the American engineer to remove all "ITT markings" from the ITT documents exported to the Singapore Company. Manager D explained that he wanted all references to ITT removed because "he prefers that TAA's be very specific, and ours [the Rochester/Singapore TAA] is not." After further discussion, Manager D backed away from his request to remove all ITT markings. Even with the full knowledge that the Rochester/Singapore TAA was not specific and did not permit the transmittal of ITT NV's export-controlled ENVG drawings and specifications, Manager D still gave the American engineer approval to send the electronic version of the export-controlled ENVG beam combiner drawing to the Singapore Company.

120. Throughout the rest of 2005, whenever ITT NV personnel asked the American engineer to transmit ENVG drawings and specifications to the Singapore Company, he requested and received specific permission for the exports from Manager D or other ITT NV employees. With Manager D's blessing, the American engineer illegally exported without a license ITT's most up-to-date ENVG specifications and drawings to the Singapore Company. By September 2005, ITT NV had illegally exported the entire ENVG "optical train" through the Rochester Company. ITT NV caused these illegal exports to take place in an effort to have the Singapore Company ready to "reënter" ITT NV's new production schedule "by the March 2006 date for production." As one ITT NV engineer recognized in an e-mail he sent to another ITT NV engineer, the whole relationship between the Rochester Company and ITT NV was nothing but a "front" for an effort to circumvent U.S. export laws.

121.  ITT NV's intent to establish a "front" for its illegal (and successful) effort to circumvent U.S. export laws was made even clearer by the nature of the relationship between the American engineer and the Rochester Company. Despite the fact that ITT NV was specifically aware of the fact that -- and had informed the Singapore Company -- that if the American engineer was not an employee of the Rochester Company, any exports sent by him or under his direction would be illegal, in fact the American engineer was in reality an employee of the Singapore Company who was merely attached to the Rochester Company. The American engineer was hired by the Singapore Company, he was supervised by Singapore Company personnel, his work was controlled by the Singapore Company, and all expenses incurred by the Rochester Company to support the American engineer were reimbursed by the Singapore Company. The American engineer was not even listed on the Rochester Company personnel chart, and he was openly referred to as a Singapore Company employee. As an employee of a foreign company, the American engineer had no right to export anything to the Singapore Company under the Rochester/Singapore TAA.

D.   **Illegal ENVG Exports to Japan and China**

122.  ITT NV engineers encountered difficulty obtaining a critical switch for the ENVG system during its developmental phrase. After experimenting with several existing switches, ITT NV concluded that it would have to design its own unique switch. In 2003, an ITT NV engineer successfully designed a unique switch (ENVG switch) that met the ENVG system's specific requirements.

123. ITT NV turned to the U.S. office of a Japanese company to manufacture the ENVG switch. Despite its full awareness that drawings and information about the ENVG switch constituted export-controlled items that would require an export license to be shipped to Japan, ITT NV failed to make any attempt to obtain the necessary export license before exporting such ENVG switch information and drawings. Between September 2003 and December 2005, ITT NV worked collaboratively with the Japanese company in an unlicensed and illegal effort to produce a final ENVG switch. During this unlicensed collaborative design and production process, ITT NV illegally exported a series of ENVG switch drawings to the Japanese company, including the final ENVG switch design. Pursuant to ITAR, ITT NV had included, on some of these drawings, specific statements that identified the drawings as export-controlled.

124. During the course of design and production of the ENVG switch, the Japanese company specifically informed ITT NV that to reduce production costs it intended to use a sister company located in China (Chinese Switch Company) during the manufacturing, assembly, and testing process. Despite ITT NV's acute awareness, derived from its prior illegal activities as described above, that China was a prohibited destination for export-controlled military items, ITT NV made no effort to prevent the Japanese company from exporting the ENVG switch designs to China. In fact, all of the export-controlled drawings and technical information that ITT NV illegally provided to the Japanese Company were subsequently transferred to the Chinese Switch Company, which ultimately produced hundreds of switches that were shipped to the Japanese company and

then to ITT NV. While ENVG switch manufacturing was eventually shifted to Japan, the Chinese Switch Company remained involved in the assembly and final testing of the ENVG switches until April 2006. The relationship between ITT NV, the Japanese company, and the Chinese Switch Company did not end until April 2006, when the illegal and unlicensed relationship between the three companies was fully uncovered.

125. Defendants' conduct as described herein jeopardized the safety of our battlefield troops to achieve short-term financial gain. Their conduct, to which ITT has now pleaded guilty, caused the Company a measurable pecuniary loss of $100 million, plus incalculable reputational loss.

126. As a result of its felonious behavior, ITT was charged with three felony counts of violating the Arms Export Control Act of 1976. Count I charged ITT with ~~violations of 18 U.S.C. §~~ 2, 22 U.S.C. §§ 2778(b)(2) and 2778(c), and 22 C.F.R. §§ 127.1(a) 127.3. Specifically, Count I of the Criminal Information ("Willful Violation of the International Traffic in Arms Regulations, Export of Defense Articles Without a License") charged that:

> On or between March 2001 and August 2001, in the Western District of Virginia, the defendant, ITT Company, did knowingly and willfully export and cause to be exported from the United States to Singapore, the People's Republic of China, and the United Kingdom, defense articles, that is, technical data related to a laser counter measure (also known as a "light interference filter") for military night vision goggle systems, which were designated as defense articles on the United States Munitions List, without having first obtained from the Department of State a license or written authorization for such exports.

127. Count II charged ITT with violations of 22 U.S.C. § 2778(c) and 18 U.S.C.

§ 2. Specifically, Count II of the Criminal Information ("Omission of Statements of Material Fact in Arms Exports Required Reports") charged that:

> On or between April 2000 and October 2004, within the Western District of Virginia, the defendant, ITT Company, did knowingly and willfully omit material facts from required reports that were necessary to make the statements in the reports not misleading, that is, that ITT Company was aware that it was violating its export licenses for the temporary export or consignment of night vision goggles or night vision parts to foreign persons for years before informing the Department of State about the violations, and that ITT Company failed to take significant corrective action to stop the ongoing violations until shortly before it informed the Department of State about the violations.

128.    ITT was also charged with a third count ("Willful Violation of the International Traffic in Arms Regulations, Export of Defense Articles Without a License"), charging that:

> On or between January 1996 and May 2006, within the Western District of Virginia, the defendants, ITT Company, did knowingly and willfully export and cause to be exported from the United States to the People's Republic of China, Singapore, and Japan, defense articles, that is technical data, including drawings and specifications and defense services related to military night vision goggles systems, including the Enhanced Night Vision Goggle System, which were designated *as* defense articles on the United States Munitions List, without having first obtained from the Department of State a license for such exports or written authorization for such exports.

Although the government has agreed to defer action regarding this count for five years, that deferment is contingent on ITT's implementation of an extensive Remedial Action Plan.

129.    According to its Report on Form 8-K filed with the SEC on March 30, 2007, in addition to its $100 million penalty, as a result of its guilty plea ITT has become subject to automatic statutory "debarment" from future export licenses. For instance, the State

63

Department has placed restrictions on ITT's shipment of technical data and night vision equipment to specific parties, to remain in effect for a period of not less than one year.

130. Moreover, although the State Department has not yet brought criminal charges against any individual officers, directors, or employees of ITT, the United States Attorney's Office stated on March 28, 2007 that the investigation was still in progress. Such a statement is unusual, and indicates that more criminal charges can be expected.

131. The gravity of the criminal charges and the size of the penalties and forfeitures incurred by ITT reflect the seriousness of ITT's illegal sales of sensitive military technology to potential adversaries of the United States, as well as ITT's subsequent concealment of those sales. The severity of :ITT's criminal acts and defendants' participation in and/or willful blindness towards these acts is escalated by the fact that such acts were committed in a pattern and practice over a long period of time.

132. On its corporate website, ITT delineates its Code of Corporate Conduct as being "Doing the Right Thing -- Always." Notwithstanding such lofty sentiment, as a result of the foregoing acts of misconduct, ITT became the first major defense contractor to be convicted of a criminal violation under the Arms Export Control Act of 1976, and was given one of the largest penalties ever in a criminal case. These acts have also stripped ITT of the reputation that befits a public Company, and weakened public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations. The damage thus done to ITT as a proximate result of defendants' conduct thus greatly exceeds the $100 million in penalties and forfitures assessed against the

Company.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (Against All Director Defendants)

133. Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

134. Each Director Defendant owed the Company and its shareholders the duty to exercise due care and diligence in the management and administration of its affairs and to make information available to ITT shareholders with all due candor. Each Director Defendant owed ITT the paramount duty not to have the Company break the law, and especially not to engage in a long-standing conspiracy to violate the export laws of the United States with regard to controlled military equipment.

135. The Director Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather was due to their intentional breach or reckless disregard of their fiduciary duties to the Company. By engaging in and/or failing to disclose ITT's pattern of illegal business practices, the Director Defendants recklessly disregarded their fiduciary duties to protect the rights and interests of ITT and its shareholders.

136. To discharge these duties, each Director Defendant was required to exercise reasonable and prudent supervision over ITT's management, policies, practices, controls and financial affairs. By virtue of this obligation and diligence, each Director Defendant was required, *inter alia*, to:

    a.    exercise reasonable control and supervision over ITT's officers,

employees, agents, business, and operations;

  b. remain informed as to how ITT was, in fact, operating and, upon receiving notice or information of an imprudent, unsound, or illegal decision, conditions, or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright mariner; and

  c. conduct the affairs of the Company in an efficient business-like manner to make it possible to provide the highest quality services while operating within the bounds of the law.

  d. In an attached press release to ITT's Report on Form 8-K filed with the SEC on March 30, 2007, defendant Loranger admitted that "[t]hese violations have made it clear that we had gaps in our compliance program." An ITT spokesman further stated, "[t]here's no question that violations occurred," which, given ITT's recitation in the Plea Agreement that *"ITT agrees that it is pleading guilty. . .because ITT is in fact guilty,"* would appear to be something of an understatement.

  137. Accordingly, the Director Defendants either intentionally or recklessly breached their fiduciary duties to the Company by, *inter alia*, permitting or causing the Company to engage in the transactions described herein, which (a) constituted felonies, (b) were in direct and knowing violation of ITAR and the Arms Export Control Act, and (c) were done to the detriment of the Company and its shareholders. Specifically, ITT

  a. knowingly or recklessly disseminated, or permitted to be

66

---

disseminated, misleading information to its shareholders, the investing public, and the public at large;

      b.    allowed the Company to engage in a pattern of improper and felonious business practices, thereby subjecting it to serious criminal charges, fines, penalties, lawsuits, and further investigations; and

      c.    failing to disclose ITT's illegal business practices to the government or to the Company's shareholders.

138. In breach of their fiduciary duties owed to ITT and its stockholders, the Director Defendants willfully failed to prevent misconduct that caused the Company to waste its valuable assets and otherwise to expend unnecessarily its corporate funds in a manner not in its best interests or its stockholders. As a result, the Director Defendants are guilty of at least inaction amounting to recklessness in failing to control ITT's employees, business, and affairs in accordance with federal law, thereby rendering them personally liable to the Company for breaching their fiduciary duties.

139. Consequently, ITT and its stockholders have sustained and will continue to sustain injury and damages by reason of the Director Defendants' intentional breach or reckless disregard of their fiduciary duties owed to the Company and its shareholders.

## COUNT II

### GROSS MISMANAGEMENT
### (Against All Director Defendants)

140. Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

141. As detailed more fully herein, the Director Defendants each possessed a duty to ITT and its shareholders to prudently supervise, manage, and control ITT's operations without having ITT commit felonies.

142. The Director Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing ITT's business and assets.

143. By subjecting ITT to the unreasonable risk of substantial losses due to their failure to monitor, prevent, and/or report the many acts of ITT managers and controlling persons that directly and knowingly violated ITAR and the Arms Export Control Act, the Director Defendants failed responsibly and with due care to oversee and implement proper business practices at ITT, thereby breaching their duties of loyalty and diligence in the management and administration of ITT's affairs and in the use and preservation of ITT's assets.

144. During the course of the discharge of their duties, the Director Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose ITT's illegal business practices in accordance with their duties to both ITT and its shareholders. As a result, the Director Defendants grossly mismanaged or aided and abetted in the gross mismanagement of ITT and its assets.

145. As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## COUNT III
### (Against The John Doe Manager Defendants For Breach of Fiduciary Duty)

146. Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

147. As detailed more fully herein, the John Doe Manager Defendants each possessed a duty to ITT and its shareholders to prudently supervise, manage, and control ITT's operations over which they had control without having ITT commit felonies.

146. The John Doe Manager Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing ITT's business and assets.

147. By subjecting ITT to the unreasonable risk of substantial losses due to the actions of the John Doe Manager Defendants that directly and knowingly violated ITAR and the Arms Export Control Act, the John Doe Manager Defendants failed responsibly and with due care to oversee and implement proper business practices at ITT, thereby breaching their duties of loyalty and diligence in the management and administration of ITT's affairs over which they had responsibility and in the use and preservation of ITT's assets.

148. During the course of the discharge of their duties, the John Doe Manager Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose ITT's illegal business practices in accordance with their duties to both ITT and its

shareholders. As a result, the John Doe Manager Defendants grossly mismanaged or aided and abetted in the gross mismanagement of ITT and its assets.

149. As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

### COUNT IV
### (Against The John Doe Law Firm For Professional Negligence and Aiding and Abetting Breaches of Fiduciary Duty)

150. Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

151. The JohnDoe Law Firm owed ITT a duty to carry out its duties competently, and within the confines of the law. It likewise had a duty not to join in, or aid and abet, any breaches of fiduciary duty of which it became aware.

152. As detailed above, the John Doe Law Firm failed to provide competent legal advice, and to take competent legal actions.

153. As detailed above, the John Doe Law Firm learned of actions constituting a breach of fiduciary duty to ITT, and joined in such actions, helped conceal such actions, and helped further such actions, all of which aided and abetted such breached of fiduciary duty.

154. As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment in favor of the Company, as appropriate, against all defendants as follows:

 a. Removing and replacing the Director Defendants as the directors of ITT, instituting a new election of directors, and appointing a receiver for the management of ITT until a new election of directors is called and determined;

 b. Declaring that the Defendants have violated and/or aided and abetted in the breach of their fiduciary duties to ITT and its shareholders, or committed professional negligence;

 c. Awarding ITT compensatory damages against the Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

 d. Awarding ITT punitive damages against the Defendants for their egregious and willful conduct;

 e. Awarding plaintiff the costs of this action, including reasonable allowances for plaintiff's attorney's and expert's fees and expenses; and

 f. Granting such other or further relief as may be just and proper under the circumstances.

DATED: August 17, 2007

        Respectfully Submitted,

        **PASKOWITZ & ASSOCIATES**

        **By:** _____
        Laurence D. Paskowitz, Esq. (LP-7324)

60 East 42nd Street—46th Floor
New York, New York 10165
Telephone: (212) 685-0969
Facsimile: (212) 685-2306

lpaskowitz@pasklaw.com


**JACOBS LAW GROUP, PC**
Samuel R. Simon
1800 John F. Kennedy Boulevard, Suite 404
Philadelphia, PA 19103
Tel: (215) 569-9701
Fax: (215) 569-9788

**ABBEY SPANIER RODD & ABRAMS, LLP**
Judith Spanier
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191


**ROY JACOBS & ASSOCIATES**
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile: (212) 504-8343

Rljacobs@pipeline.com


Attorneys for Plaintiff

# EXHIBIT A

# EXHIBIT A



212 EAST 39TH STREET

NEW YORK, NEW YORK 10016

PHONE 212 889 3700

FAX 212 684 5191

www.abbeyspanier.com

ATTORNEYS AT LAW

NANCY KABOOLIAN

nkaboolian@abbeyspanier.com

April 12, 2007

**Via Certified Mail**

The Board of Directors
ITT Corporation
c/o Steven R. Loranger,
Chairman, President and Chief Executive Officer
4 West Red Oak Lane
White Plains, N.Y. 10604

Re:   ITT Corporation's Violations The Arms Expert Control Act

Dear Mr. Loranger and members of the Board of Directors:

I write on behalf of our client Anthony Reale, a shareholder of ITT Corporation ("ITT" or the "Company").

On March 27, 2007, after a federal investigation that lasted for more than five years, ITT pled guilty to violating various provisions of federal law relating to the International Traffic in Arms Regulations ("ITAR"). Specifically, as a result of the activities of certain ITT executives, ITT pled guilty to knowingly and willfully exporting and causing to be exported from the United States to Singapore, the People's Republic of China and the United Kingdom, defense articles, including technical data related to a laser counter-measure for military night-vision goggle systems, without having first obtained from the Department of State the necessary license or written authorization for such exports. In addition, ITT pled guilty to knowingly and willfully failing to state in required consignment-related reports that it was aware that it was violating its export licenses. According to the Deferred Prosecution Agreement entered into by the Company, the State Department uncovered a pattern of violations of the export laws spanning from the 1980's to 2006. This egregious misconduct, has caused ITT to expend millions of dollars in investigation and defense costs, as well as the cost of the substantial monetary fines imposed. ITT's reputation and standing in the business community have been damaged by the Company's guilty plea to federal felony charges.

ABBEY SPANIER RODD ABRAMS & PARADIS, LLP

The Board of Directors
April 12, 2007
Page 2

As a result of the plea agreement, the Company will pay a $50 million fine[1] and agreed to invest in research and development and capital improvements for its night-vision products. The value of these investments is $50 million. However, the plea agreement provides that the government may give any of the technology developed with this money to ITT's competitors, thus causing ITT and its shareholders to finance those companies which compete directly with the Company. In addition, the State Department has placed restrictions on certain exports of night-vision equipment and technical data, and ITT will be prohibited from shipping night-vision devices to specified parties for a period of not less than one year.

Pursuant to Count I of the government's criminal information for violation of the Arms Export Control Act (the "Information"), ITT admitted that it knowingly and willfully exported and caused to be exported from the United States items and information that were designated as "defense articles" on the United States Munitions List without first having obtained permission from the Department of State. This practice and pattern of consistent behavior occurred over at least the six-month period March-August 2001.

Pursuant to Count II of the Information, ITT admitted that it knowingly and willfully omitted material facts that were necessary to make its reports to the government not misleading. In other words, ITT failed to inform the government that it was aware of its violations of federal arms export controls, and failed to take significant corrective action to stop the ongoing violations. This practice and pattern of consistent behavior occurred over the 4½-year period April 2000-October 2004.

Although the prosecution under Count III of the Information was deferred, ITT admitted that the government had probable cause to bring the charges contained therein, which alleged a 10-year practice and pattern of willful and knowing export of prohibited materials without having first obtained permission from the State Department.

Finally, according to the government, ITT's management "created an atmosphere where U.S. export laws were viewed as an obstacle to getting business done." Thus, a combination of grossly inadequate resources devoted to compliance with U.S. export laws and a negative attitude towards compliance led to a regular, corporate-wide pattern of export violations and misrepresentations to the government for at least the past 25 years.

Moreover, management caused the Company to resist the government investigation after it *knew* that criminal conduct had occurred. According to United States Attorney Thomas Brownlee, the Company engaged in this meritless defense to "essentially run the out the clock" on the statute of limitations. Individuals caused the

---

[1] On March 30, 2007 ITT paid $28,000,000 to the U.S. Department of Treasury Forfeiture Fund; $2,000,000 will be paid on the day of sentencing; and $20,000,000 will be paid at the direction of the Department of State.

ABBEY SPANIER RODD ABRAMS & PARADIS, LLP

The Board of Directors
April 12, 2007
Page 3

Company to take action that made it difficult for the government to uncover the full truth, including asserting "questionable privileges" and lying to the government about when the violations had been discovered and for how long they had been occurring.

The individuals responsible for this harm to ITT should be held accountable to the Company for the damage they have caused. Their wrongdoing has cost the Company far in excess of the $100 million in fines and other penalties the Company is paying and will pay. The Company has lost substantial good will, paid bonuses that should not have been paid, and incurred substantial legal fees without any legitimate purpose. As a result of the wrongdoing perpetrated by ITT's executives, we demand that the Company commence legal proceedings against the individuals responsible for this misconduct for their breaches of fiduciary duties, for causing the Company to engage in illegal conduct or for failing properly to oversee the Company's operations so as to prevent such misconduct, and for engaging in violations of law, thereby exposing the Company to millions of dollars in damages.

The individuals responsible for the above-described conduct, and those who chose to continue operating in this fashion while covering up continued violations, should be held accountable to the Company. Their actions in both committing and enabling illegal conduct was deliberate and calculated, and had no legitimate purpose. In this regard I invite your attention to page 4 of ITT's own Code of Corporate Conduct, which states that accountability "is a fundamental value with broad implications."

This constitutes a demand that the Board take the necessary action to identify the wrongdoers and take legal action against them to redress the wrongs they have committed which so grievously harmed ITT. Please respond to this letter within 30 days to advise me of the steps the Board of Directors is taking to identify the persons responsible and to take the necessary action against them.

Very truly yours,

Nancy Kaboolian

# EXHIBIT B

# EXHIBIT B

## VERIFICATION

I, Anthony Reale, the Plaintiff in this action, under pain and penalty of perjury under the laws of the United States, state that I have reviewed the foregoing Complaint, and believe its allegations to be true, to the best of my information, knowledge and belief.

Signed this ____ day of August, 2007.

_____
Anthony Reale